May it please the Court, my name is Lee Nelson, and together with Juan Tudela-Lazama, we represent the appellant, Mr. Darren Flores, who's joined us today from Saipan. With the Court's permission, I'll seek to reserve five minutes for rebuttal. I wasn't going to give a factual explanation, but given what Justice Christian said a moment ago in the other case, why don't I give a little bit of factual background before I delve into what I think are the key issues here. Briefly, this Court concerns the Union Bank's refusal to pay Mr. Flores on a certificate of deposit that he purchased in September of 1993. It's a $200,000 certificate of deposit, a huge amount of money for the Flores family. He bought the certificate by selling some of the family's farmland. Mr. Flores, our original appellant, passed away during the appeal, but he was a farmer on the island of Saipan. Five years and five months after he bought the CD, in February of 1999, he went to the bank to inquire about his money. He met with the same bank officer who had sold him the CD in the first place. She told him that she couldn't find a record of the CD, so he asked, well, what should I do? And she said, and this is key, you should go find the CD and bring it to the bank. That's all she said. She did not tell him there was another way to get the money back, by signing an indemnity. Mr. and Mrs. Flores finally found the CD nine years later, in 2008. Now, if we fast forward to the District Court's decision, the bank brought a motion for summary judgment, two motions, actually four motions. But the Court ruled in the bank's favor, finding that the statute of limitations had already run, and also, alternatively, ruled that the doctrine of latches. Now, we contend on this appeal that the bank officer's instruction that he should find the CD and return to the bank means there was no refusal by the bank. Or viewed another way, the bank officer's instruction, coupled with Mr. and Mrs. Flores's good faith reliance on that instruction, prevented Mr. Flores from understanding that he had suffered an injury. So without a refusal by the bank, and without knowledge of his injury, Flores's causes of actions did not accrue in February of 1999. How is it that your client didn't know he was injured? He couldn't get his money. That's right. He lost the certificate, and he couldn't get his money. So I think I understand that other parts of your argument, that he's relying on what they told him to do, which is go find the certificate. And that took some years, in this case, before his wife finally found it. But how is it he didn't know he was injured? He couldn't get his money. He, well, you know, the way I look at what the bank officer told him, it was good news and bad news. The bad news is, I can't find your record of your CD. The good news is, you can get your money if you find it. Well, the first kind of miraculous news was that she remembered him, right? She remembered that he'd come in and purchased the CD. Well, Your Honor, Saipan's a small place, and people know each other or are related to each other. Yes, but she was still there, and it was some, Alaska's a small place, too, I get that. But, yes, but it had been many years, and so that jumped out of the record at me, that she remembered absolutely. And then, paradoxically, had no record of it at all. That's a lot of money. It is a lot of money, and we're very concerned that the bank didn't have a record. Right, so he knew he was injured, wasn't he? Wasn't that pretty clear to him? Well, he, well, what I, what Mr. and Mrs. Flores thought was, yes, the bank can't find it. So they didn't know they were injured. They knew the bank didn't have a record. But they thought that their CD, which that bank officer had signed, and which they had the original, was the bank's record. Right, they said find it. Yes, find it. That's all they said, go find it. The bank at no point refused to make a payment. Counsel, you, your relating of the facts tracks pretty well with Mr. Flores' own declarations. But that's not what the district court relied on. What the district court looked to was Mr. Flores' deposition, where he was asked in a number of different ways, did you go in in 1999 to get your money? You weren't just checking on the status of the account. It wasn't like an, I need an account balance or something like that. But he was asked, but he was asked whether he went in there to get his money, and he answered pretty clearly, yes, I went in there to get my money. That's why I went in there. I wanted my money. Isn't that sufficient to be a demand? That's what the district judge found, and she's reported to be relying on what Mr. Flores testifies. She's not making findings of fact. She's simply taking the facts as Mr. Flores uttered them. So, where did the district court err here? Well, it erred. The demand needs to be coupled with a refusal. He may have made a demand, so for the sake of argument, let's say that he did make a demand. He went in to get his money. Wouldn't you take that as a refusal? No, Your Honor. He says he went in to get his money, and he came out without the money. Right. What he came out with was, go find the CD. We don't have the record. We're an incompetent bank. That's a refusal to give him the money unless he does something else, which is to come up with the CD. Well, so I take it your argument, as I understand it, is that one could view that, instead of you find the CD. Yes. Sort of like, I want dessert, and mom says, as soon as you've eaten all your vegetables, you can have your dessert. And if it takes two hours, you sit there and eat your vegetables. That's what I say to my children. So, so... What about the fact that this took five and a half years to eat the vegetables? I mean, it took five and a half years to get the... At some point, would it be too long? Very bad vegetables. Very bad vegetables. But at some point, would it be too long? No, the modern trend is for, as we've cited in our brief, the modern trend is that anyone can go and should be able to go and redeem their CD regardless. California, for example, does not have a statute of limitations on demand for a bank deposit. Yes, but there's also the question of latches, and the district court granted summary judgment on that, too. Yes. That's why, that ends my question. How long is too long? How long is too long? Well, it would be too, there's probably several ways to answer that question. We would contend that the district court erred in finding latches was a valid defense at all, because the bank has unclean hands, because it caused the delay by telling him to go and find his CD. And presumably by losing, by losing its own records. I mean, the bank lost the records and now is saying, well, we don't want to give you money because you lost your records. That's right. It's a battle of the lost records. Yeah. So is it fair? So you think they can't invoke, just to kind of finish that thought, you think they can't invoke this defense, and that's how the district court erred here? That is, I think they erred in two ways. First, the statute of limitations could not run until the bank actually made a refusal. It did not make that refusal, I would contend, until they had answered the complaint, or until Mr. Flores was forced to file his complaint. Well, before that, there was a written demand made by his lawyer. Yes, there was in 2008. In 2008. Yes. And so why isn't that a demand? It's a demand, but again. And a refusal. Forgive me, and a refusal. Well, it wasn't a refusal. What there was, was a letter back from Union Bank, which I have here. It's in the record, Your Honor. Yep. And if we look at the Second Circuit's case, Garcia v. Chase Manhattan Bank, the court in that case said a refusal needs to be clear and unequivocal. Well, what's unclear about the fact that that letter pretty clearly says the money's not going to come from the bank? It didn't say we're not. It said to go check with the state, right? That's what it did. It said, you need to go and check to see if it is treated to the state. Right. And what are the achievement laws? Under what circumstances does a bank say, we no longer want to be responsible for this deposit because we don't know where the owner is? I don't, Your Honor. I'm sorry. I'm not a banking lawyer. Has anybody bothered to check with California to find out whether he's got, whether the Secretary of State is holding something? Yes. His first counsel did write some letters to some agency of the state of California. I don't think we have that in the record. Oh. Just for clarification, that the money had not, in fact, it's cheated. I think, I don't want to speak for Judge Biden, but at least that's my question. I don't think that loop was ever closed here in this record. Is that, am I missing it? I'm sorry, Your Honor. It's a very thick record. I don't know whether it's in the record or not, but I did see a letter written by former Chief Justice Dela Cruz, who was representing Mr. Flores initially in this matter, and he had written a letter to some agency in the  And did we get a letter back from the bank, or from the state of California that we have in our record? I do not know. Sorry. I haven't seen that myself. I just saw that the other day preparing for this argument, Your Honor. So the letter from the Union Bank, going back to that just briefly, you're right. It doesn't say, no, we're not going to pay you. It just says, gee whiz, we don't have a record. Why don't you check with the state? That's all it says. So is it your contention, then, that the bank had an obligation to maintain records in perpetuity? No, Your Honor. I don't know what the banking law would require, or SOX, or any other law. I know that banking is a highly regulated industry, and we would like the opportunity to have a proper hearing on latches to determine exactly what the bank does. It has, allegedly, a seven-and-a-half-year document retention policy. It's put that out there. Why would latches even be the appropriate remedy here? That's an equitable remedy. This is not an action in equity. Precisely. That's what we said. Well, then why do you want a hearing on latches if latches are not applicable? Your contention is the latches are not applicable. I'm agreeing with you, and now you're disagreeing with me. So now I'm confused. Let me retract that. Yes. No, if it turned out that this case were reversed and remanded and latches were still an issue, then it would be – it's an issue that I think would serve the law. I think my question goes to – the bank says, look, we've only got records for seven-and-a-half years. Do you know whether there's a regulation that requires the bank to do that or that permits the bank, then, to divest itself of its records after seven-and-a-half years? Why doesn't the bank know whether this CD has been redeemed, whether it was issued to the state, whether somebody else came in and claimed it, whether they lost it? I don't know, Your Honor. I don't know why they don't keep records. I'm a little suspicious that they don't have the records. Your contention is – the bank says, look, we keep these records for seven-and-a-half years. The CD matured in 1993, just a month after he placed it with us. We don't have any further records of this, and therefore we're not responsible for it. Your contention is, until we've made a demand and the six-year statute of limitations, plus six years, you have got to keep the records there. Why are both sides so confused over what the obligation of the bank is to maintain these funds or not maintain these funds? Only five years and five months after he bought the CD, the bank didn't have a record. We don't know if that record was – why that record wasn't there. It was not there either because the bank lost it, which is negligence, or it never made the record, which is fraud. We don't know the reason there was no record, Your Honor. The document retention policy that the bank has tried to defend itself with wouldn't come into play at all because they lost the record in five years and five months, but that policy is seven-and-a-half years long. Okay, so that might suggest some negligence on the part of the bank, but your client doesn't come in for many, many years later, well after the seven-and-a-half-year document retention. You wouldn't get the benefit of that rule under your theory if the bank can divest itself of its records after seven-and-a-half years. I'm trying to figure out, you want an unlimited time for him to make that demand, then six years after he makes the demand and is refused in which to bring his lawsuit. So that's time of demand, whatever that is. That could be 50 years plus six. Well, no, Your Honor, what we want is we want the clock on the statute of limitations to start at the time the bank made a clear refusal. Right, that's right, but if he doesn't make a demand, they can't make a refusal. So if he doesn't show up until 50 years after he places the CD, the bank can't refuse him. It's a certificate, Your Honor, and it says on the face of it that they'll pay the bearer, Mr. Donald Flores, upon presentation of the CD. Right, so your theory is he could show up 50 years later, and once they refuse him, he has an additional six years to bring a suit. That would be 56 years, right, in my hypothetical. I think that Mr. Flores would have liked to have had the money a lot sooner than that. I got that, counsel. I'm trying to figure out here. There just seems to be an enormous amount of – there's a huge black hole in the middle of this record, which is what is the obligation of the bank to maintain the funds in near perpetuity until a demand is made? And I don't – I seem to sense that there's no answer to that question. It just strikes me as really unusual that a bank wouldn't know how long it had to hold your funds and keep a record of it. Yes, Your Honor, I don't know how long a bank is required to hold it under banking regulations. And under your theory of the case, under my hypothetical, the bank would have to hang on to it for 56 years. I think a bank should pay back people that it takes money from. And if that takes 50 years and someone can prove by the presentation of the CD that the bank owes them the money, they should pay it back, yes. You've used most of your time, but we'll give you a couple of minutes for rebuttal. Okay, thank you. Good morning, Your Honors. May it please the Court, my name is Sean Frank, the attorney for MUFG Union Bank. I think I've been listening to the questions posed to Mr. Nelson. I think there's a couple key points to be made from the outset. The first is, of course, that this is an appeal. And we're looking at the decision made by Judge Mangalonia at the district court level. Admittedly, this is a de novo review, but she had limited information when she made the decision. And importantly, at this point, many of the arguments that are being made now by the appellant were never made. And we've objected to those arguments, of course, I'm sure. Well, the key question about when the statute of limitations accrued and when it ran, that's been the center of the case the whole time. Yes, ma'am. So there's no question that's in front of us. Yes, ma'am. And I guess I have some concern about the fact that when the initial request was made, how do I get my money? Right. The bank had no record, even though it was clear that the plaintiff paid money and had a certificate of deposit that was issued to him. And if he could find it, he could get paid right then. Okay? So when he is told, go find the CD and we'll pay you, essentially, why is that a refusal? Well, a couple things. First of all, the record doesn't say that the bank had no records. Yes, but that's why it matters that the teller remembered darn well. Of course. Yes, she remembered him. And this is, of course, we have to accept the facts as proposed by Mr. Flores for the purpose of this motion. She remembered him and she went and looked. She asked for a Social Security number and she went and looked in the records to see at that time whether there was any records. I believe it's on the record that the search, he estimated, took about ten minutes. And we now know that either something was lost or never made or not found. I think the latter is a safe assumption. We don't know. But one of those things happened. And because he actually did have the CD, presumably the bank should have paid him then if he had been able to produce it. It does say you have to produce it. But why is it a refusal to say, bring us the CD and then you can get paid? Well, first of all, I don't believe that the refusal is a necessary element of the question here. The question is, under the statute, was a demand made that day? And I believe Judge Bybee is correct. When you look at the record from the deposition, unquestionably there was a demand made that day. Importantly also, sorry, go ahead. Is it your position that if someone says, give me my money, and you say, sure, the check's in the mail, we'll get it to you, that the bank can forever refuse or decline or never get around to it and the statute of limitations runs? No. No, that's not my contention. My contention is what the facts show is that Ms. Guerrero told him that day that she could not pay him. Until he produced the CD. And then he asked, how do I get paid? And she said, you need to get the CD. Right. So back to my question. Forgive me, but I didn't mean to interrupt. But I think that there's some testimony he gave after the fact at his deposition about did he want to get his money, and Judge Bybee has reviewed that testimony. But I think his testimony is in terms of what he said to the teller that day was, how do I get my money? And her response was, you need to bring in the CD. There's a distinction there. So that's just my point before you go on. But also that he asked for the money, and she said she couldn't give it to him. Let's get back to my question. If your position is that you need a demand but no refusal to start the clock ticking, then any time someone asks for their money and the bank says, sure, we'll get it to you, and they never do, then the person has to file suit right then. That's a very odd way to run a railroad. I understand the court's concern. And what case law supports that no refusal is required? Well, the statute itself, just requiring a demand. It's a demand that starts the cause of action running. But there's a body of case law out there that suggests that demand in this context means something more formal that involves knowing that your demand is not going to be met. I'd point out, first of all, the body of case law, I'm not sure what the court's referring to, but it was, of course, never presented to Judge Mangalonia at the time. Secondly, as I pointed out in the briefing, Section 3804, even had Mr. Flores never gone to the bank, once the CD was lost, Mr. Flores had the ability to immediately file suit against the bank to obtain payment. That's under Section 3804. So on the date that this occurred, he had the ability, if the CD was lost, which is what he says it was, to maintain an action against the bank for payment of the CD. Except it seems really like a stretch to me that the bank, I don't see anywhere in the records that the bank told him that.  So now the bank's in the position of saying that he's unreasonable because basically he did what they told him. He went to look for the CD. I just want to give you an opportunity to respond to that. For eight years, and then we were talking about the eat your vegetables and then you'll get your dessert, and I throw in one more additional fact pattern, one additional fact to that fact pattern. In 2001, of course, the bank left the CNMI, and we know that by 2000... Which may have told the statute of limitations. Well, I don't think it does, and that certainly wasn't raised to Judge Manglonia below. No, but she rejected your theory. Which was? That once you left, that that started... That was the Nguyen case. Yes, Your Honor, and that matter's not on appeal right now. But what I would say is that by 2003, Mr. Flores knew, we can prove, and we know from the facts that Mr. Flores was well aware that the Union Bank had left the CNMI because he opened an account with First Hawaiian Bank, the successor account. So if you put into the fact pattern we're talking about, if you eat your vegetables, you don't get dessert, during the time the child is taking, five and a half years to eat their vegetables, mom and dad leave, and there's no way to get the dessert. That also went into the fact pattern. Can you shed any light on the exchange I had with Mr. Nelson about the obligation of the bank to maintain the funds in near perpetuity, and why would they have this seven and a half year policy? Is that dictated by some banking regulation? How is it that the bank could maintain its funds for seven and a half years and then just say, no, we don't know what happened to them? We might have spent them, we might have given them away. If you look in the record, there is a declaration filed by a banking expert in which he talked about records retention policy. In fact, he's a records retention expert. He talked about records retention policies, talked about industry standards, seven and a half years is the industry standard. Okay, but seven and a half years sounds like is an industry standard, is different from a duty to maintain the funds for a demand deposit or for perhaps a CD. A certificate of deposit is a unique animal under the ECC, I agree, Your Honor. And if you look at the cases, there are many cases out there where certificates of deposits are redeemed many, many years later. Exactly. Right. So do they ever expire? They don't expire by their own terms. No, Your Honor. At least this one did not. So when that certificate of deposit is presented as it eventually was, the bank still owes it. There's a reason for the demand requirement, though, and there's a reason that the statute of limitations starts running upon demand. But is that correct? Typically, yes. Let's say he had never talked to the bank until 2008. Yes, Your Honor, you're correct. He said, look, I finally found it. Here it is. And that was their first exchange. They would have to pay him at that point, would they not? Yes, ma'am. And so the only reason you think they don't have to pay him is that he made an earlier inquiry where he was told to do the exact thing that you say requires the bank to pay him, which is present the CD. So the fact that he had a conversation a few years earlier in an effort to understand what he was supposed to do is what now disallows, in your view, that he can get the money that he's owed. During the conversation, he was also told he wouldn't be paid, which brings in the statute of limitations. I understand the Court's concern, but that's the law, and it was a balancing act that was put together by the UCC Committee. I'd point out that at the time, this is a 1983 version, I believe, and still in full effect, that was a decision that was made countrywide on what we do with CDs and demand instruments. Does the bank have a theory as to what happened to these funds, or is this just tough luck and now the bank gets to keep the money? The statute of limitations ran, and now that's just what happens. Yes, Your Honor, we have a theory, but it's outside the record. I'm not sure we should go there. Counsel, we've talked a lot about what does or does not constitute... Outside the record before this Court, to be clear. Yes, ma'am, sorry. That's all right. We've talked a lot about what constitutes a demand, sort of in the abstract, but what about the face of the certificate as evidence of a party's contract? In other words, it says what these guys agreed to, these folks agreed to, is that he was going to present that certificate in order to get paid. Why isn't that the conduct that is required in order to make a demand? There's a world of difference between presentment and demand. That's actually one of the main issues that was briefed at length and discussed at length with Judge Mangalonia in which she based her decision upon. Presentment is a, gosh, I want to say a 10-section portion of the commercial paper provisions of the law, and it deals with particular matters related to presentment. The CD itself set forth the requirements for presentment. Demand, as is pointed out, in which Judge Mangalonia correctly ruled, is a different animal. So he had to do both things, according to you, in order to successfully demand his money. He would have had to show up with a certificate, which is presentment. For it to be a presentment, yes. Okay. Yes, ma'am. Thank you. At the place. And I'd point out one other issue when we're talking about presentment, is that presentment is waived when, in circumstances such as this, the place of presentment or the person to be presented to is no longer available. And that's the bank leaving the Commonwealth as well. That's Section 35042. So. So it's your position that because they left CNMI, they have no obligation? Is that what you're saying? Or because didn't they take on the obligations of the criticism of the bank? The bank leaving the CNMI goes into the analysis of whether or not Mr. Flores is reasonable in his actions, given the information. And I realize the court's concern. Okay. But you're not saying that that means that that's the reason they would never have to pay. No, ma'am. Because they did purchase that obligation. Yes, ma'am. Okay. I understand the court's concern regarding latches and equity and law. Again, that's a new issue. It was never raised below. Judge Manglonia dealt with the facts and the argument placed before her at the time. Continue even today. There's new arguments being made that were never raised before in previous briefings. And to overturn a judge on arguments and facts that were not presented to her just flies in the face of the standards for appellate review. And I'd point out, and I don't want to bang this drum too often, but an appellant was given three opportunities to explain and was told they needed to, essentially. First in our motion to dismiss or strike, then in the reply motion to strike, which was denied without prejudice, then in our opening brief to say, you have to justify why you're raising issues for the first time, why they weren't raised below. And that's never been attempted. And I'd submit to the court, without that first step, all these new arguments, respectfully, they're just not supposed to be considered. Counsel, if you haven't convinced me about the 2008 demand, then my question is, if the statute started then, and this is truly hypothetical, but if the statute started at that point because the lawyer's letter was in demand. There's two letters, I believe, in the record, but yes. I think that's right. But if you could just accept that for purposes of my question, I'd appreciate it. Sure. All right. So if that's what triggered the clock to start running, and if I don't find any tolling, if I'm unconvinced by the tolling arguments, doesn't the Consumer Protection Act claim still survive? And the breach of contract. Right. I'm talking about of the tort claims. The other tort claims, then, I think would be if there's no tolling, they're going to be too late. Right. The three tort claims with two-year statutes. Right, but not the Consumer Protection Act claim. That's got a four-year statute, and that would be timely, right? Yes, ma'am. The breach of contract is a six-year statute. Thank you. Thank you. Thank you, counsel. Thank you. Mr. Nelson, you have two minutes for rebuttal. Thank you. Thank you. Yeah, I would argue that it's clear the case law requires a refusal, and that should be the law, because without understanding that the bank was refusing to pay him, he didn't realize that he was injured. And your contention is that a refusal is not the flip side of a demand, that is that you could have a demand without having a refusal. That's a very good question, Your Honor. I hadn't thought of it that way. But I think a demand deserves a response. Usually it's a conversation. There should be something that the bank replies with. And here the bank replied with, hmm, go find your CD and bring it back to us. That was the conversation. And if the bank says we'll give it to you on Friday, that's not a refusal? Give you what, the money, Your Honor? Uh-huh. If the bank had said that, Mr. Flores would have gladly accepted that. And if the bank then didn't give him the money on Friday, then the fact of not giving him the money would be the refusal, but not the refusal on Tuesday when he showed up at the bank. If the bank said, come Friday and we'll give you the money, and then he came and they didn't give him the money, then I suppose he would be put on notice that there was something wrong. But here Mr. Flores wasn't put on any notice at all because they told him to go find the CD. It seems to me there's some ambiguity at his deposition about what he was thinking he wanted to accomplish that day and what he told her. I get both senses from the record about that. But what does seem to be clear at ER 77 is that his impression was that she told him, you can't have your money unless you present your CD. That's right. That's what she told him. What I have a harder time ferreting out is whether he told her, I want my money, as opposed to him thinking that. I think that's a little bit muddy here. He says clearly that he asked her, what do I need to do to get my money? Yes, it's always been our contention that he was simply inquiring. I mean, he had a deposit there, a CD, for five and a half years. He couldn't find it. So he went to inquire about it. Hmm. She surprisingly said, we can't find a record of it. Oh, imagine the worry about that. The bank found the fact that they told Mr. Flores that they couldn't find a record as constituting a refusal. But I would offer that if somebody told me that they couldn't find a record, that would be a motivator to do the other thing the bank said to do, which is to go find the CD. And in good faith, they believed that they needed to find the CD. And in their depositions, they're very clear that they thought they had no rights without finding the CD. What's the significance of the fact that this CD actually matured in, I think, 32 days or something? It matured right away, but it was the family left it there for five and a half years. Yes, they left it there for five and a half years because immediately after buying it, they went to California for Mrs. Flores' kidney transplant. And they told the bank officer that they were going to be gone for a long time. I don't know why she sold them a 32-day CD, but she also told them that it would roll over in perpetuity. I think that's a common practice among banks. So maybe he thought, hmm, oh, it's going to roll over. That's fine. I'll just take a 32-day CD. Did he testify to that, about it rolling over? Yes. From his perspective, he thought it was going to continue to roll over? Yes, that's in his very lengthy deposition at some point. I can't cite the record. Thank you, counsel. Thank you very much. The case just argued is submitted, and we appreciate, again, the helpful arguments of counsel.
judges: Graber, Bybee, Christen